**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRIUMVIRATE, LLC, | ) No. 1:18-cv-00511 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Hon. Royce C. Lamberth |
| | ) |
| RYAN ZINKE, *et al*., | ) |
| | ) |
| Federal Defendants. | ) |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION [ECF NO. 3]**

**AND**

**MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE
12(b)(1) AND 12(b)(6)**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

   I.   FACTUAL BACKGROUND........................................................................ 2

   II.   STATUTORY BACKGROUND .................................................................. 4

       A.    National Environmental Policy Act .......................................... 4

       B.    Federal Land Policy and Management Act................................ 5

       C.    Administrative Procedure Act.................................................... 6

STANDARD OF REVIEW ......................................................................................... 7

ARGUMENT .............................................................................................................. 8

   I.   PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS ................ 9

       A.    PLAINTIFF CANNOT ESTABLISH STANDING................................... 9

           1.    Plaintiff Lacks Article III Standing................................. 9

           2.    Plaintiff Lacks Prudential Standing .............................. 12

       B.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS NEPA CLAIMS ....................................................................... 16

           1.    BLM reasonably concluded that the ASG permit did not present substantially different environmental concerns or implicate a significant change in circumstances than those analyzed in the Triumvirate EA, and thus no new NEPA process was required. .................................................... 16

           2.    Because its DNA is reasonable, BLM was not required to consider additional alternatives to the proposed action or provide for additional public comment......................... 23

       C.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS FLPMA CLAIMS ....................................................................... 26

       D.    PLAINTIFF'S APA CLAIM FAILS ....................................... 31

   II.   PLAINTIFF FAILS TO ESTABLISH IMMINENT, IRREPARABLE HARM ....... 32

      A.     PLAINTIFF'S ALLEGED HARM IS NEITHER IRREPARABLE NOR IMMINENT ..................................................................... 32

      B.     PLAINTIFF'S DELAY COUNSELS AGAINST A FINDING OF IRREPARABLE HARM ......................................................... 35

   III. THE EQUITIES COUNSEL AGAINST INJUNCTIVE RELIEF ............................ 36

CONCLUSION ..................................................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Allen v. Wright,*
    468 U.S. 737 (1984) ........................................................................................... 9

*Am. Bird Conservancy, Inc. v. FCC,*
    516 F.3d 1027 (D.C. Cir. 2008) ....................................................................... 25

*Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc.,*
    580 F. Supp. 932 (D.D.C. 1983) ........................................................................ 7

*Amoco Prod. Co. v. Gambell,*
    480 U.S. 531 (1987) .................................................................................... 35, 37

*ANR Pipeline Co. v. FERC,*
    205 F.3d 403 (D.C. Cir. 2000) ......................................................................... 14

*Brady Campaign to Prevent Gun Violence v. Brownback,*
    110 F. Supp. 3d 1086 (D. Kan. 2015) .............................................................. 35

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F. Supp. 2d 1 (D.D.C 2009) ...................................................................... 34

*Buckeye Cablevision, Inc. v. United States,*
    438 F.2d 948 (6th Cir. 1971) ........................................................................... 31

*California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior,*
    767 F.3d 781 (9th Cir. 2014) ........................................................................... 25

*California Forestry Ass'n v. Thomas,*
    936 F. Supp. 13 (D.D.C. 1996) ........................................................................ 14

*California v. Watt,*
    683 F.2d 1253 (9th Cir. 1982), *rev'd on other grounds sub nom.,*
    *Secretary of the Interior v. California,* 464 U.S. 312 (1984) ................................. 25

*Cement Kiln Recycling Coal. v. EPA,*
    255 F.3d 855 (D.C. Cir. 2001) ......................................................................... 30

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................... 8, 32

*Citizens to Pres. Overton Park v. Volpe,*
    401 U.S. 402 (1971) ........................................................................................... 7

*Clark v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) ......................................................................................... 13

*Cobell v. Babbitt,*
    91 F. Supp. 2d 1 (D.D.C. 1999), *aff'd and remanded sub nom.*
    *Cobell v. Norton,* 240 F.3d 1081 (D.C. Cir. 2001) .......................................... 32

*Colorado Envtl. Coal. v. Dombeck,*
    185 F.3d 1162 (10th Cir. 1999) ....................................................................... 17

*Colorado Wild Horse v. Jewell,*
    130 F. Supp. 3d 205 (D.D.C. 2015) ........................................................... 17, 24

*Competitive Enters. Inst. v. U.S. Dep't of Agric.,*
    954 F. Supp 265 (D.D.C. 1996) ......................................................................... 7

*Ctr. for Food Safety v. Vilsack,*
    636 F.3d 1166 (9th Cir. 2011) ......................................................................... 35

*Ctr. For Food Safety v. Vilsack,*
   753 F. Supp. 2d 1051 (N.D. Cal. 2010) ............................................................. 35
*Daubert v. Merrell Dow Pharm., Inc.,*
   509 U.S. 579 (1993) .......................................................................................... 21
*Davis v. Pension Benefit Guar. Corp.,*
   571 F.3d 1288 (D.C. Cir. 2009) .................................................................... 8, 35
*Detroit Int'l Bridge Co. v. Gov't of Canada,*
   192 F. Supp. 3d 54 (D.D.C. 2016), *aff'd,*
   875 F.3d 1132 (D.C. Cir. 2017) ........................................................................ 32
*El Rescate Legal Servs. v. Exec. Office of Immigration Review,*
   959 F.2d 742 (9th Cir. 1991) ............................................................................ 32
*Fla. Audubon Soc. v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ...................................................... 10, 11, 12, 15
*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) .......................................................................... 11
*Found. on Econ. Trends v. Heckler,*
   756 F.2d 143 (D.C. Cir. 1985) .................................................................... 33, 34
*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
   232 F. Supp. 3d 53 (D.D.C. 2017) ........................................................ 17, 23, 33
*Friends of the Clearwater v. Dombeck,*
   222 F.3d 552 (9th Cir. 2000) ............................................................................ 24
*Fund for Animals v. Frizzell,*
   530 F.2d 982 (D.C. Cir. 1975) .......................................................................... 36
*Fund For Animals v. Norton,*
   281 F. Supp. 2d (D.D.C. 2017) ........................................................................ 33
*Furlong v. Shalala,*
   156 F.3d 384 (2d Cir. 1998) ............................................................................. 31
*GEO Specialty Chems., Inc. v. Husisian,*
   923 F. Supp. 2d 143 (D.D.C. 2013) .................................................................... 8
*Grand Lodge of Fratenal Order of Police v. Ashcroft,*
   185 F.Supp.2d 9 (D.D.C. 2001) .......................................................................... 7
*Gunpowder Riverkeeper v. F.E.R.C.,*
   807 F.3d 267 (D.C. Cir. 2015) .................................................................... 13, 14
*Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice,*
   816 F.3d 1241 (9th Cir. 2016) .......................................................................... 11
*Hazardous Waste Treatment Council v. Thomas,*
   885 F.2d 918 (D.C. Cir. 1989) .......................................................................... 14
*Herbert v. Architect of the Capitol,*
   839 F. Supp. 2d 284 (D.D.C. 2012) .................................................................. 30
*Hill Dermaceuticals, Inc. v. Food & Drug Admin.,*
   709 F.3d 44 (D.C. Cir. 2013) .............................................................................. 4
*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.,*
   45 F. Supp. 3d 14 (D.C. Cir. 2014) .................................................................. 10
*Karst Envtl. Educ. and Prot., Inc. v. EPA,*
   475 F.3d 1291 (D.C. Cir. 2007) .......................................................................... 6

*Konarski v. Donovan*,
   763 F. Supp. 2d 128 (D.D.C. 2011) ........................................................................ 7
*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................ 21
*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .................................................................................... 32
*League v. U.S. Forest Serv.*,
   No. 4:11CV00425 JM, 2016 WL 3511691 (E.D. Ark. Mar. 16, 2016) .................. 25
*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................................ 31
*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................... 9, 10, 11, 22
*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .......................................................................................... 13, 31
*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .......................................................................................... 17, 23
*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) .......................................................................................... 13, 15
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) .................................................................................................. 7
*Munaf v. Green*,
   553 U.S. 674 (2008) ................................................................................................ 7
*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) .................................................................................... 11
*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
   No. 15-CV-01582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016) .................... 35
*Nevada Land Action Ass'n v. U.S. Forest Serv.*,
   8 F.3d 713 (9th Cir. 1993) ...................................................................................... 13
*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ........................................................................ 36
*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................ 37
*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .............................................................................................. 5, 6
*Nw. Airlines v. FAA*,
   795 F.2d 195 (D.C. Cir. 1986) ................................................................................ 10
*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) ............................................................................ 36
*Or. Nat. Res. Council v. Thomas*,
   92 F.3d 792 (9th Cir. 1996) .................................................................................... 31
*Preferred Risk Mut. Ins. Co. v. United States*,
   86 F.3d 789 (8th Cir. 1996) .................................................................................... 31
*Public Citizen, Inc. v. NHTSA*,
   489 F.3d 1279 (D.C. Cir. 2007) .............................................................................. 11
*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.*,
   415 F.3d 1078 (9th Cir. 2005) .......................................................................... 13, 15

*Ray Charles Found. v. Robinson*,
  795 F.3d 1109 (9th Cir. 2015) ........................................................................ 7
*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................................................ 5
*Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*,
  No. 17-CV-2758 (CRC), 2018 WL 784061 (D.D.C. Feb. 8, 2018) ...................... 35
*Sampson v. Murray*,
  415 U.S. 61 (1974) ..................................................................................... 8, 33
*Schmier v. U.S. Ct. of Appeals for the Ninth Cir.*,
  279 F.3d 817 (9th Cir. 2001) ...................................................................... 9, 10
*Sea Containers Ltd. v. Stena AB*,
  890 F.2d 1205 (D.C. Cir. 1989) ....................................................................... 7
*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ........................................................................ 8
*Sierra Club v. Martin*,
  110 F.3d 1551 (11th Cir. 1997) ..................................................................... 32
*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ...................................................................................... 11
*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................ 10, 11
*Steel Co. v. Citizens for Better Env't*,
  523 U.S. 83 (1998) ........................................................................................ 10
*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................. 11, 22
*Town of Stratford, Connecticut v. F.A.A.*,
  285 F.3d 84 (D.C. Cir. 2002) .................................................................... 15, 16
*Trinity Cty. Concerned Citizens v. Babbitt*,
  No. Civ.A. 92-1194, 1993 WL 650393 (D.D.C. Sept. 20, 1993) ...................... 13
*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) .......................................................................... 7
*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ........................................................................................ 5
*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................ 9
*Wash. Legal Clinic for the Homeless v. Barry*,
  107 F.3d 32 (D.C. Cir. 1997) ........................................................................ 30
*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ...................................................................................... 37
*Wild Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017) ........................................................................ 28
*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................................ 7, 8, 37
*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 8

## Statutes

5 U.S.C. § 702 ........................................................................................................ 6, 31
5 U.S.C. § 704 ............................................................................................................. 6
5 U.S.C. § 706 ........................................................................................................... 2, 4
5 U.S.C. § 706(2)(A) ................................................................................................... 6
16 U.S.C. § 3120 ....................................................................................................... 19
42 U.S.C. § 4321 ......................................................................................................... 5
42 U.S.C. § 4332(2)(C) .............................................................................................. 5
43 U.S.C. § 1701 ....................................................................................................... 37
43 U.S.C. § 1701(a)(8) ............................................................................................... 6
43 U.S.C. § 1702 ....................................................................................................... 37
43 U.S.C. § 1702(c) .................................................................................................... 6
43 U.S.C. § 1702(h) .................................................................................................... 6
43 U.S.C. § 1712(a) .................................................................................................... 6
43 U.S.C. § 1712(e) .................................................................................................... 6
43 U.S.C. § 1732(a) .................................................................................................... 6

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 7, 9, 12
Fed. R. Civ. P. 12(b)(6) ...................................................................................... 2, 9, 13
Fed. R. Evid. 702 ...................................................................................................... 21

## Regulations

40 C.F.R. §§ 1500-1508 ............................................................................................. 5
40 C.F.R. § 1501.1(a) .................................................................................................. 5
40 C.F.R. § 1501.3 .................................................................................................... 17
40 C.F.R. § 1501.4(b) .................................................................................................. 5
40 C.F.R. § 1502.12 .................................................................................................. 24
40 C.F.R. § 1502.9(c) ................................................................................................ 17
40 C.F.R. § 1505.1 ...................................................................................................... 5
40 C.F.R. § 1508.9 ............................................................................................. 5, 17, 24
40 C.F.R. § 1508.9(a)(1) .............................................................................................. 5
40 C.F.R. § 1508.10 ............................................................................................. 17, 24
43 C.F.R. § 1601.0-5(n) .............................................................................................. 6
43 C.F.R. § 1610.1(b) .................................................................................................. 6
43 C.F.R. § 1610.5-3(a) ............................................................................................... 6
43 C.F.R. § 2932.26 .................................................................................................. 29
43 C.F.R. § 46.120 ............................................................................................... 5, 17
47 C.F.R. § 1.1307 .................................................................................................... 25

## Other Authorities

BLM Planning Handbook,
    https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf ...................... 27
Casey Grove, *Second heli-skier dies from 'huge' Haines-area avalanche*,
    Anchorage Daily News,

https://www.adn.com/alaska-news/article/second-heli-skier-dies-huge-haines-area-avalanche/2012/03/15/ (last visited March 12, 2018)..............................................................4

Karen Garcia, *Avalanche buries, kills SEABA guide*,
Chilkat Valley News,
http://www.chilkatvalleynews.com/story/2014/03/20/news/avalanche-buries-kills-seaba-guide/6109.html (last visited March 12, 2018)........................................................4

Tordrillo Mountain Lodge,
https://www.tordrillomountainlodge.com/ (last visited March 12, 2018) ...............................2

U.S. Dep't of Justice, *Southeast Heli-Ski Company Enters Guilty Plea*,
https://www.justice.gov/usao-ak/pr/southeast-heli-ski-company-enters-guilty-plea
(last visited March 12, 2018)......................................................................................4

## TABLE OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| ASG | Alaska Snowboard Guides |
| BLM | Bureau of Land Management |
| DOI | Department of the Interior |
| DNA | Determination of NEPA Adequacy |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FAA | Federal Aviation Administration |
| FERC | Federal Energy Regulatory Commission |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| SIR | Supplemental Information Report |
| SMG | Silverton Mountain Guides |
| TGR | Teton Gravity Research |

## <u>TABLE OF EXHIBITS</u>

Ex. 1            Declaration of Stephanie Kuhns

Ex. 2            Environmental Assessment

Ex. 3            Decision Record/FONSI

Ex. 4            ANILCA 810 Determination

Ex. 5            Triumvirate Permit

Ex. 6            Teton Gravity Research Permit

Ex. 7            Silverton Mountain Guides Permit

Ex. 8            Alaska Snowboard Guides Permit

Ex. 9            Triumvirate Operating Plan

Ex. 10           Alaska Snowboard Guides Determination of NEPA Adequacy

Ex. 11           Alaska Snowboard Guides Operating Plans

Ex. 12           Ring of Fire ROD and RMP

**INTRODUCTION**

Plaintiff asks this Court for the extraordinary remedy of a preliminary injunction without establishing that it has standing to even bring this action, and without satisfying any of the four factors required for a preliminary injunction.  Plaintiff, a private company currently benefiting from a Special Recreation Permit ("permit") allowing it provide helicopter-skiing (or "heli-skiing"), seeks to enjoin a new permit issued by the U.S. Bureau of Land Management ("BLM") to another private company, Alaska Snowboard Guides ("ASG").  However, Plaintiff fails to establish that its alleged injuries, consisting of potential economic harm, theoretical public health and safety concerns, and alleged procedural violations, are concrete, particularized, or imminent, or satisfy the zone of interests protected by the National Environmental Policy Act ("NEPA").  The Court can deny Plaintiff's Motion for Preliminary Injunction, ECF No. 3 ("Pl.'s Mot."), and dismiss Plaintiff's Complaint, ECF No. 1, on this basis alone.

Plaintiff also fails to satisfy the four factors needed for injunctive relief.  Plaintiff cannot show that it will suffer imminent, irreparable injury in the absence of an injunction.  Plaintiff's alleged procedural injury fails, standing alone, to establish irreparable harm.  Plaintiff fails to provide the Court with factual or precedential support for its theoretical public health and safety concerns.  Similarly, Plaintiff fails to establish a likelihood of success on the merits of its NEPA and Federal Land Policy and Management Act ("FLPMA") claims.  Plaintiff fails to show that BLM's reliance on previous NEPA analysis for a permit that is essentially the same in its environmental consequences violates NEPA, and that BLM's permit to ASG violates the governing Ring of Fire Resource Management Plan ("RMP").  Finally, the balance of hardships and public interest weigh against the extraordinary relief of a preliminary injunction.  For these reasons, the Court should deny Plaintiff's Motion.

## BACKGROUND[1]

### I.    FACTUAL BACKGROUND

Plaintiff is a private company specializing in outdoor recreation services in remote areas of Alaska.  *See* https://www.tordrillomountainlodge.com/, last visited March 12, 2018.  In 2014, Plaintiff was issued a permit by the BLM Anchorage Field Office, which allowed the company to offer heli-skiing in the Neacola and Tordrillo Mountains of south-central Alaska.  Declaration of Stephanie Kuhns, Ex. 1, ¶ 3.  The Neacola and Tordrillo Mountains are managed by BLM as federal public lands, and the region includes the Neacola Mountains Area of Critical Environmental Concern ("ACEC"), an area designated as such because of its scenic value. February 3, 2014 Environmental Assessment ("EA"), Ex. 2, 2.

Plaintiff submitted its application for a permit to BLM in January 2012.  Kuhns Dec. ¶ 3. Because a portion of the lands carry the ACEC designation, BLM conducted an EA that analyzed the potential environmental impacts of heli-skiing in the area.  EA 1.  BLM issued a Decision Record and Finding of No Significant Impact ("FONSI") on February 20, 2014, finding that the proposed heli-skiing activities "will provide a unique recreational experience in a remote and primitive setting, consistent with the [Resource Management Plan] goals for the Neacola Mountains ACEC without compromising other resource values."  Decision Record, Ex. 3, 2. Plaintiff's permit was issued that same day, authorizing Plaintiff to operate from February through April in approximately 428,000 acres of BLM-managed lands with a maximum of 130 landings over the course of the season.  Kuhns Decl. ¶¶ 3, 13.

---

[1] Federal Defendants provide the Court with facts for purposes of showing a lack of irreparable harm.  As this is an APA case, the Court should not consider facts outside of materials that were before the agency decision maker at the time of issuing ASG's permit.  *See* 5 U.S.C. § 706. Further, the Complaint can be dismissed under Federal Rule of Civil Procedure 12(b)(6) for lack of prudential standing, discussed *infra*, without examining outside facts.

In addition to Plaintiff, several companies have held permits allowing helicopter activities in the Neacola and Tordrillo Mountains.  Plaintiff is correct that it was the first company to hold this particular permit for recreational heli-skiing, which for a time allowed it to enjoy sole commercial heli-skiing capabilities in the area.  While Plaintiff was awaiting its permit, Teton Gravity Research ("TGR"), a commercial filming company that produces extreme sports movies, applied for a land use permit with BLM for the same 428,000 acre area.  *Id.* at ¶ 6.  TGR was awarded an initial one-year land use permit for commercial filming in 2013.  TGR Permit, Ex. 9.  TGR did not operate in 2014, but applied for and was granted a three-year land use permit which was valid from 2015-2017.  Kuhns Decl. at ¶ 8.  In 2016, Silverton Mountain Guides ("SMG") applied for a permit to provide heli-skiing operations in the same area.  *Id.* at ¶ 9.   Using a Determination of NEPA Adequacy ("DNA"), BLM issued the permit on February 27, 2017, with the result that three operators were permitted to utilize the same 428,000 acres of land.[2]  *Id.* Later in 2017, Alaska Snowboard Guides ("ASG") applied for a permit to provide heli-skiing operations in the same area.  *Id.* at ¶ 10.  TGR's permit was expiring and the company stated that it would not renew it.  BLM used a DNA and issued a permit to ASG on January 28, 2018, which kept the number of permitted operators at three.  *Id.*  All current permittees are limited to 130 helicopter landings each per season.  *Id.* at ¶¶ 13-16.

In addition to the facts affirmatively provided above, several assertions made by Plaintiff in the Declaration of Michael Overcast ("Overcast Decl.") are either not properly before this Court or are simply inaccurate.  As discussed in the Declaration of Stephanie Kuhns ("Kuhns Decl."), Plaintiff's assertion that BLM "is the only government entity in North America,"

---

[2] In 2016, shortly after SMG applied for a permit, another operator also applied for a permit, but the operator's plans were incompatible with the area and BLM declined to issue the permit. Kuhns Dec. ¶ 7.

allowing multiple helicopter operators in the same area is unsupported and, with regard to Alaska, incorrect.  Overcast Decl., ECF No. 3-1, ¶ 18.  Plaintiff makes this assertion without providing any evidence in support, and Ms. Kuhns' declaration clarifies that she has firsthand knowledge of the State of Alaska authorizing multiple operators in single areas.  Kuhns Dec. ¶ 18.  Plaintiff also makes claims, without support, that "there have been . . . three deaths in connection with BLM-permitted helicopter skiing."  Overcast Decl. ¶ 18.  This statement is untrue and an unfortunate fact for Plaintiff to misrepresent.  Three people were killed in 2012 and 2014, respectively, in snow-related accidents on State of Alaska, not BLM-managed, lands.  *See* http://www.chilkatvalleynews.com/story/2014/03/20/news/avalanche-buries-kills-seaba-guide/6109.html, last visited March 12, 2018, and https://www.adn.com/alaska-news/article/second-heli-skier-dies-huge-haines-area-avalanche/2012/03/15/, last visited March 12, 2018.  And, one person was killed on BLM-managed lands when their heli-skiing tour group, permitted to operate on State land only and not BLM land, trespassed onto BLM lands.[3]  *See* https://www.justice.gov/usao-ak/pr/southeast-heli-ski-company-enters-guilty-plea, last visited March 12, 2018.

## II.   STATUTORY BACKGROUND

### A.   National Environmental Policy Act

---

[3] The Court should decline to consider the majority of Mr. Overcast's declaration when it determines Plaintiff's likelihood of success on the merits.  BLM's decision in this case is governed by the APA, and is limited to the documents considered by the agency decision maker. 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party").  "[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013).  Paragraphs of the declaration that support Plaintiff's argument on the merits and do not purport to address standing or imminent, irreparable harm, should be disregarded.

NEPA is intended to foster better decision making and informed public participation for actions that affect both people and the natural environment. *See* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(a). NEPA establishes the procedures by which federal agencies must consider the environmental impacts of their actions, but does not dictate the substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978). Under NEPA, federal agencies should prepare a detailed Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether an action requires an EIS, the agency may prepare an EA. 40 C.F.R. § 1501.4(b). An EA is a concise public document that briefly describes the proposed action, examines alternatives, and considers environmental impacts. *Id.* § 1508.9. If the agency concludes that no significant impacts are likely to result from the proposed project, it may issue a Finding of No Significant Impact and need not prepare an EIS. *Id.* § 1508.9(a)(1).

Regulations promulgated by the Council on Environmental Quality, 40 C.F.R. §§ 1500-1508, provide guidance for NEPA implementation and are entitled to deference. *Methow Valley*, 490 U.S. at 355. Agencies adopt internal procedures, reviewed by CEQ for compliance with NEPA, to implement NEPA. 40 C.F.R. § 1505.1. BLM's NEPA implementing regulations allow for a DNA, which incorporates existing NEPA analysis for assessing the impacts of a proposed action when there is no new information or changed circumstances requiring the preparation of additional NEPA analysis. *See* 43 C.F.R. § 46.120.

B. <u>Federal Land Policy and Management Act</u>

BLM's management of public lands is governed by FLPMA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) ("*SUWA*"). In FLPMA, Congress declared it the policy

of the United States that "the public lands be managed that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; [and] that, where appropriate . . . will provide for outdoor recreation and human occupancy and use" 43 U.S.C. § 1701(a)(8). FLPMA provides that "management be on the basis of multiple use and sustained yield," *see* 43 U.S.C. §§ 1732(a), 1702(c), (h) , which has been described as "deceptively simple" and includes the "enormously complicated task of striking a balance among the many competing uses to which land can be put," *SUWA,* 542 U.S. at 58.

Under FLPMA, BLM manages the public lands using a multi-step planning and decision process. BLM develops a land use plan (typically referred to as a "resource management plan" or "RMP") that, among other things, establishes allowable resource uses and sets forth goals and objectives for management of resources subject to BLM's stewardship. *See* 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n). An RMP is generally prepared on a "resource or field office area basis." 43 C.F.R. §§ 1601.0-5(n), 1610.1(b). Specific resource management authorizations and actions must be consistent with the applicable RMP. 43 C.F.R. § 1610.5-3(a); *see also* 43 U.S.C. § 1712(e).

C. Administrative Procedure Act

Courts review challenges brought under NEPA pursuant to the APA. 5 U.S.C. §§ 702, 704; *Karst Envtl. Educ. and Prot., Inc. v. EPA,* 475 F.3d 1291, 1297 (D.C. Cir. 2007). The APA provides a deferential standard for review of a challenge to an agency action. In examining such a challenge, a reviewing court applies the standard in 5 U.S.C. § 706(2)(A), and determines whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The question is not whether the Court itself would have made the same

decision, because "the court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971) (citations omitted). Rather, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision that did not constitute a clear error of judgment or exceed the bounds of its statutory authority. *Id.* It is the plaintiff's burden to prove that these criteria are not met and that the agency's decision was arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## STANDARD OF REVIEW[4]

The grant of a preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Green*, 553 U.S. 674, 689 (2008) (citation omitted); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "As an extraordinary remedy, courts should grant such relief sparingly." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C. 2011). "[T]he party seeking injunctive relief bears a substantial burden to show that the party is entitled to such an extraordinary remedy." *Competitive Enters. Inst. v. U.S. Dep't of Agric.*, 954 F. Supp 265, 269 (D.D.C. 1996); *see also Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc.*, 580 F. Supp. 932, 935 (D.D.C. 1983); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989). Ultimately, "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and

---

[4] Plaintiff's failure to establish Article III standing is reviewed under Federal Rule of Civil Procedure 12(b)(1). Under Rule 12(b)(1), the parties seeking to invoke the jurisdiction of a federal court—plaintiff here—bear the burden of establishing that the court has jurisdiction. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000). "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fratenal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13–14 (D.D.C. 2001). Plaintiff's failure to show that its alleged injuries fall within NEPA's zone of interests is reviewed under Rule 12(b)(6). For a court considering this type of dismissal, "the central question is whether [a plaintiff] alleges injuries to precisely the sorts of . . . interests the [statute] protects." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1123 (9th Cir. 2015).

inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 89 (1974)).

This circuit applies the traditional four-part test for issuing a preliminary injunction. A party seeking injunctive relief pursuant to a motion for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) that he would suffer irreparable injury if the injunction were not granted; (3) that the balance of the equities tips in his favor; and (4) that the public interest would be furthered by the injunction. *Winter*, 555 U.S. at 10; *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The movant has the burden to show that all four factors are satisfied. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009). While some courts apply these factors on a sliding scale, "the movant must, at a minimum, demonstrate that irreparable injury is likely in the absence of an injunction" [and a] mere possibility of irreparable harm is not enough." *GEO Specialty Chems., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) (citations and internal quotation marks omitted); *see also Sherley*, 644 F.3d at 393 ("We need not wade into this circuit split today because, as in *Davis*, as detailed below, in this case a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis.").

## ARGUMENT

The Court should deny Plaintiff's motion and dismiss this case entirely because Plaintiff fails to establish Article III standing, or, for its NEPA claims, prudential standing. Plaintiff fails to satisfy the injury in fact element of Article III standing because its alleged injuries are neither concrete and particularized nor imminent. Further, Plaintiff fails to demonstrate that its alleged injuries fall within NEPA's zone of interests as required to establish prudential standing. As

such, the Court should dismiss Plaintiff's Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(1) and (6) .

Even if the Court finds Plaintiff has standing, Plaintiff is not entitled to the extraordinary relief it seeks because it cannot satisfy any of the four elements required for a preliminary injunction. Plaintiff's alleged harms are neither irreparable nor imminent, Plaintiff cannot demonstrate a likelihood of success on the merits of its claims, and Plaintiff fails to show that the balance of the equities tips in its favor or that an injunction is in the public interest. Accordingly, Plaintiff's Motion should be dismissed.

## I.    PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  PLAINTIFF CANNOT ESTABLISH STANDING

#### 1.  Plaintiff Lacks Article III Standing

This Court should deny Plaintiff's Motion and dismiss Plaintiff's Complaint on the grounds that Plaintiff lacks standing to bring its claims. The critical threshold inquiry for jurisdiction in the federal courts is whether a plaintiff has demonstrated a "case or controversy" between the parties within the meaning of Article III of the United States Constitution. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A core component of the case or controversy inquiry is the doctrine of standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984). To establish standing, plaintiffs bear the burden of demonstrating, at an "irreducible minimum," that: (1) they have suffered a "concrete and particularized" injury which is "actual and imminent" rather than "conjectural or hypothetical;" (2) the injury was caused by or is "fairly traceable to" the action of the defendants; and (3) a favorable decision by the court is likely to redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Moreover, the alleged injury must have actually occurred or be imminent. *Schmier v. U.S. Ct. of Appeals for the Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2001).

Hypothetical, speculative, or other possible future injuries do not suffice to establish the requisite injury in fact.  *Id*; *see also Nw. Airlines v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) (holding that plaintiff failed to allege sufficient injury in fact by alleging only the threat of future injury).

Plaintiff has not alleged a concrete and particularized injury to establish Article III standing.  Injury in fact is "the '[f]irst and foremost' of standing's three elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

A "'concrete' injury must be '*de facto*': that is, it must actually exist."  *Id.*; *see also Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996).  Plaintiff has not alleged a de facto harm in its Complaint, its brief, or in the Overcast Declaration, that stems from BLM's issuance of a new permit to a business competitor.  Plaintiff alleges three types of injuries: (1) potential economic losses, *see* Overcast Decl. ¶¶ 23, 26; 38d; 38e; 38f; 38g; 38j; 42, (2) theoretical safety concerns, *see id.* at ¶¶ 19; 20; 38a; 38b; 38c; 41, and (3) an alleged procedural deficiency by BLM, *see id.* at ¶¶ 25; 27-37; 38h; 38i.  These potential and speculative injuries do not satisfy the injury in fact element of standing.  Plaintiff has not provided the Court with factual support showing that its business has actually suffered or is likely to suffer as a result of the challenged action.

Similarly, Plaintiff does not provide the Court with any support showing a likely increase in avalanches or accidents.  Instead, Plaintiff merely posits that such events may occur.  Such speculative fears do not establish "concrete and particularized" and "actual or imminent" injuries.  *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F.

Supp. 3d 14, 24 (D.C. Cir. 2014); *see also Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816

F.3d 1241, 1250 (9th Cir. 2016); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C.

Cir. 2015) (noting that "[t]he Supreme Court has repeatedly held that disputes about future

events where the possibility of harm to any given individual is remote and speculative are

properly left to the policymaking Branches, not the Article III courts." (quoting *Public Citizen,*

*Inc. v. NHTSA*, 489 F.3d 1279, 1295 (D.C. Cir. 2007))(internal quotation marks omitted)).

Plaintiff's alleged procedural injuries, absent a concrete, particularized, and imminent

injury-in-fact, have no significance.  As the Supreme Court has explained, "deprivation of a

procedural right without some concrete interest that is affected by the deprivation—a procedural

right *in vacuo*—is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555

U.S. 488, 496 (2009); *accord Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15-16 (D.C. Cir.

2011).

Finally, Plaintiff's sole alleged environmental harm is to Dall sheep; Plaintiff speculates

that new operators may create additional disturbance to Dall sheep habitat.  Pl.'s. Br. at 23; Pl's.

Compl. ¶¶ 138-39.  In *Lujan*, the Supreme Court reiterated that "the injury in fact test requires

more than an injury to a cognizable interest.  It requires that the party seeking review be himself

among the injured."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (quoting *Sierra Club v.*

*Morton*, 405 U.S. 727, 734-735 (1972)) (internal quotation marks omitted); *accord Spokeo, Inc.*

*v. Robins*, 136 S. Ct. 1540, 1548 (2016).  In the environmental context, "generalized harm to

[federal lands] or the environment *will not alone support standing*, [but] if that harm in fact

affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."

*Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2002) (citing *Morton*, 405 U.S. at 734-36)

(emphasis added); *accord Fl. Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996).  Here,

Plaintiffs have alleged no interest at all in Dall sheep.  Plaintiff's complaint alleges that "BLM's authorization of two additional heli-skiing operations in the same terrain creates additional impacts to wildlife," but not how those alleged impacts affect Plaintiff's own interests.  Pl.'s. Compl. ¶ 137.  In its opening brief, Plaintiff asserts in a conclusory manner that "[w]hile Triumvirate does not know what the cumulative impact of ASG's operations will be on wildlife . . . these ecological impacts are certain, actual and imminent," but likewise makes no attempt to tie those alleged impacts to Plaintiff's interests.  Plaintiff's lone declaration comes no closer, mentioning "wild sheep and other wildlife" precisely once – in alleging that BLM failed to evaluate the effects of increased helicopter flights – and alleging no interest by Triumvirate in wildlife of any kind.  Overcast Decl. ¶ 37.  Because Plaintiff has failed to allege an interest in Dall sheep, Plaintiff lacks standing to bring its NEPA claim regarding the Dall Sheep, and this Court should dismiss that claim.[5]

For these reasons, Plaintiff has failed to demonstrate a sufficient injury in fact to establish Article III standing, and this Court should accordingly dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(1).

2.   Plaintiff Lacks Prudential Standing

In a NEPA case, plaintiffs must show the failure to prepare NEPA documentation will cause a distinct risk to a particularized interest of the actual plaintiffs.  *Fla. Audubon Soc'y*, 94 F.3d at 664.  The mere alleged violation of a procedural requirement does not permit any and all

---

[5] Moreover, this is not a pleading defect which can be easily cured.  For example, it is difficult to see how Plaintiff could assert a recreational or aesthetic interest in the Dall sheep, given that Plaintiff is a commercial heli-skiing provider who operates pursuant to a permit requiring it to avoid visible sheep "as well as any habitats that are mapped by BLM as high use areas."  Ex. 5 at 3.  Additionally, Plaintiff's declarant represents that Dall sheep do not frequent the areas where heli-skiing takes place.  *See* Attach. A to Kuhns Decl.

persons to sue the government.  *Id.*  Furthermore, because the plaintiff here challenges Federal

Defendants' NEPA compliance under the APA, plaintiff must also demonstrate that the injuries

fall within the "zone of interests" that NEPA was designed to protect.  *Lujan v. Nat'l Wildlife*

*Fed'n,* 497 U.S. 871, 883 (1990).  The purpose of NEPA is not to protect economic interests, and

plaintiffs who assert only economic, and not environmental, injuries do not have standing to

challenge an agency action under NEPA.  *Nevada Land Action Ass'n v. U.S. Forest Serv.,* 8 F.3d

713, 716 (9th Cir. 1993); *see also Trinity Cty. Concerned Citizens v. Babbitt*, No. Civ.A. 92-

1194, 1993 WL 650393 at *5-6 (D.D.C. Sept. 20, 1993).  The "zone of interests" test "exclude[s]

those plaintiffs whose suits are more likely to frustrate than to further statutory objectives."

*Clark v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).

Plaintiff fails to demonstrate that its alleged injuries fall within NEPA's zone of interests

and its NEPA claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  It is

well-settled that "[t]he zone of interests protected by the NEPA is, as its name implies,

environmental[.]"  *Gunpowder Riverkeeper v. F.E.R.C.*, 807 F.3d 267, 274 (D.C. Cir. 2015).

Thus, "NEPA is concerned with harm to the physical environment: 'If a harm does not have a

sufficiently close connection to the physical environment, NEPA does not apply.'"  *Ranchers*

*Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.*, 415 F.3d

1078, 1103 (9th Cir. 2005) (quoting *Metro. Edison Co. v. People Against Nuclear Energy,* 460

U.S. 766, 778 (1983)).

Plaintiff does not allege that BLM's issuance of a permit to ASG harms the physical

environment.  Instead, Plaintiff alleges potential economic injuries, theoretical injuries to public

health and safety, and procedural injuries under NEPA.  None of these injuries fall within

NEPA's zone of interests.  Regarding Plaintiff's economic injuries, Plaintiff claims injuries to its

business in the form of money spent on the 2014 EA, Overcast Decl. ¶ 23, potentially higher costs for helicopter operations, *id.* at ¶ 38g, and potential loss of earnings from unhappy customers, *id.* at ¶¶ 26; 38d; 38e; 38f; 38j; 42.  These are plainly economic injuries outside of NEPA's zone of interests. *See Gunpowder Riverkeeper*, 807 F.3d at 274*; ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000).

      In a case similar to the one here, the D.C. Circuit addressed a NEPA claim brought against the Federal Energy Regulatory Commission ("FERC") because FERC issued a license to the plaintiff's business competitor.  *ANR Pipeline Co.*, 205 F.3d at 404-06.  Like the finite area shared by heli-skiing operators, the two pipeline operators in *ANR Pipeline* sought access to one shared natural resource.  *Id.* at 404.  The plaintiff pipeline operator claimed that FERC should have considered the environmental effects of the two companies' operations together before approving a license.  *Id.* at 407-08.  The D.C. Circuit rejected this attempt to use NEPA as a weapon in the parties' dueling economic competition over a shared resource, noting that plaintiff's main concern was "suppressing competition" and that such an economic interest "is not within the zone of interests protected by NEPA."  *Id.* at 408 ("But ANR has not alleged that it will suffer any environmental injury as a result of the Commission's action."); *see also California Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 22 (D.D.C. 1996) (Finding that plaintiffs lacked standing under NEPA's zone of interest test; "plaintiffs' interests must be 'systematically, not fortuitously' or 'accidentally' aligned with those that 'Congress sought to protect.'") (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989)).

      Plaintiff also alleges theoretical injuries to public health and safety.  Overcast Decl. at ¶¶ 19; 20; 38a; 38b; 38c; 41.  Plaintiff asserts that the permit issued to ASG, "if multiple operators are stacked on the same terrain," could "potentially" cause an avalanche, *id.* at ¶ 19, or an

accident, *id*. at ¶ 38c.  Again, these theoretical, speculative injuries are not injuries to the physical environment as required to establish standing.  *See Metro. Edison Co.,* 460 U.S. 766 at 775-79 (holding that agency was not required to consider potential health injuries caused by risk of an accident in NEPA analysis because "[i]f a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply"); *see also Ranchers Cattlemen*, 415 F.3d at 1103-04 ("While it is true that NEPA contains references to human health in its statement of policy . . . as the Supreme Court has explained, those references are to the statute's goals, not its means . . . Here, [Plaintiff] has failed to show any relationship between risks to human health and environmental harms.").  NEPA "cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant." *Town of Stratford, Connecticut v. F.A.A.*, 285 F.3d 84, 88 (D.C. Cir. 2002) (finding that plaintiff lacked prudential standing where it asserted general safety concerns and economic injuries only).

Finally, Plaintiff appears to allege a procedural injury under NEPA, resulting from BLM's alleged lack of communications before issuing its DNA and permit.  *See* Overcast Decl. ¶¶ 25; 27-37; 38h; 38i.  As the D.C. Circuit has held, in order to establish standing in the NEPA context, "a prospective plaintiff must demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation." *Fla. Audubon Soc*, 94 F.3d at 664-65 ("a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.").  As an initial matter, BLM *did* communicate with Plaintiff regarding the permit it was issuing to ASG (*See* Kuhns Decl. ¶ 17).  Further, BLM was not required to communicate with Plaintiff in issuing a DNA as discussed *infra* in section II.B.2.  Regardless, Plaintiff only identifies economic and theoretical safety injuries, not a

particularized injury to the physical environment, and the alleged procedural deficiency is insufficient to establish prudential standing.

In sum, there can be no reasonable argument that in enacting NEPA Congress intended to benefit the business interests of heli-skiing operators. Nor can Plaintiff's speculative and unsupported assertions of potential injuries to the public reasonably be considered within the statute's zones of interest. The D.C. Circuit has squarely held that such claims "may not be raised by a party with no claimed or apparent environmental interest." *Stratford,* 285 F.3d at 88. As such, Plaintiff's Motion should be denied and Plaintiff's NEPA claims should be dismissed.[6]

### B.  PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS NEPA CLAIMS

1.  BLM reasonably concluded that the ASG permit did not present substantially different environmental concerns or implicate a significant change in circumstances than those analyzed in the Triumvirate EA, and thus no new NEPA process was required.

Plaintiff argues that BLM violated NEPA when it failed to adequately assess safety and environmental impacts associated with the issuance of a special recreation permit to ASG.[7] Pl.'s Mot. 12-18. Because the effects of heli-skiing were considered in an earlier EA, whose adequacy Plaintiff obviously deemed sufficient, these claims rise and fall on whether a significant change in circumstances warranted additional NEPA analysis. The record shows that BLM reasonably concluded that the nearly identical use ASG proposed was adequately assessed in the earlier EA, and that no new NEPA document was required. Consequently, Plaintiff's NEPA claims have no likelihood of success.

---

[6] Federal Defendants also dispute that this Court is the correct venue for Plaintiff's claims and are filing a Motion to Transfer Venue concurrently with this filing.

[7] For the reasons discussed *supra*, Plaintiff's proffered safety concerns fall outside of the zone of interests protected by NEPA and cannot serve as a basis for setting aside BLM's permitting decision. But in any case, as discussed *infra*, BLM – as a responsible steward of Federal lands – accounted for foreseeable public safety issues in all of its heli-skiing permitting decisions.

It is well established that an agency may rely on a previous EA when it finds that no new or changed circumstances warrant preparation of additional NEPA analysis. *See* 40 C.F.R. §§ 1501.3 and 1502.9(c). Agencies document such findings in internal memoranda, including DNAs or Supplemental Information Reports ("SIR"). *See e.g.*, *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 383-85 (1989) (approving the U.S. Army Corps of Engineers' use of a SIR to analyze the significance of new technical information). Although DNAs are not "NEPA documents" within the meaning of 40 C.F.R. § 1508.10, courts uphold the use of DNAs as long as the proposed action does not exceed the intensity and scope of the action that was analyzed earlier. *Colorado Wild Horse v. Jewell,* 130 F. Supp. 3d 205, 216-18 (D.D.C. 2015); *see also Friends of Animals v. U.S. Bureau of Land Mgmt.,* 232 F. Supp. 3d 53, 66 (D.D.C. 2017). BLM's NEPA-implementing regulations allow the agency to support an action with an existing environmental analysis as long as there are no "new circumstances, new information or changes in the action or its impacts" that result in "*significantly* different environmental effects." 43 C.F.R. § 46.120 (emphasis added). Whether new information is "significant" is a factual issue, and consequently courts review an agency's decision that no additional NEPA analysis is required under the highly deferential arbitrary and capricious standard based on the record before the agency at the time of the decision. *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1178 (10th Cir. 1999).

Due to the requested permit location including an ACEC, BLM first prepared an EA before issuing a permit to Plaintiff to determine if the environmental impacts of the proposed heli-skiing use were likely to be significant. *See* 40 C.F.R. §§ 1501.3, 1508.9. The Triumvirate EA considered the potential impacts of Plaintiff's heli-skiing operations, which would involve two helicopters and one airplane and with a maximum number of landings set at 130 annually.

EA 6-7.  In regards to impacts to the environment, BLM found that permitting heli-skiing would not impact the visual beauty of the area in any more than a transient fashion because "[d]aily mountain winds and snowstorms would rapidly erase all evidence of this use allowing subsequent users to experience the pristine and untrammeled beauty of the Neacola Mountains" and because heli-skiing, due to its temporary duration and intermittent use, "can be implemented in a manner that does not permanently impair existing wilderness characteristics."  *Id.* at 11.  In considering possible cumulative impacts to the aesthetic and recreational value of the area, BLM found that "[i]ncreased interest from commercial recreation providers, commercial filming companies, and aircraft transportation services may result in increased noise and observed aircraft in the areas," but that "there is no substantial cumulative impact to the existing quality recreation experience due to the area's expanse where visitors can spread out and avoid others."  *Id.* at 12.

Regarding impacts to wildlife, BLM found that the area of the Neacola and Tordrillo Mountains are inhabited by moose, caribou, Dall sheep, wolverine, wolf, black bear, brown bear, and several species of raptors, but that Dall sheep reside in the alpine areas and are therefore most likely to be affected.  *Id.*  Because the characteristics that lead to desirable ski slopes may occur adjacent to good winter sheep-habitat, BLM was understandably concerned that sheep could be exposed to effects from overflights by helicopters.[8]  *Id.* at 13.  As a result, BLM required that:

---

[8] BLM noted, however, that "[p]opulation size and winter distribution of Dall sheep in the area of the proposed action is currently unknown," creating uncertainty as to whether and where heli-skiiers might interface with sheep.  Consequently, BLM's SRP permits allow for the possibility of additional restrictions as habitat data becomes available.  *See, e.g.*, ASG Permit at 3.  Plaintiff has not alleged any new data concerning these interactions that warrant alteration of its permit conditions.  Plaintiff's declarant represents that Dall sheep do not frequent the areas where heli-skiing takes place.  *See* Attach. A to Kuhns Decl.

> "[Under the permit] aircraft and ground activities will maintain 1,500 feet vertical and horizontal distance from visible goats and sheep, as well as any habitats that are mapped by BLM as high use areas.  Aircraft will not land within ½ mile of habitats that are mapped as high use areas.  As new data becomes available, any nearby authorized activities will be reviewed accordingly."

*Id.* at 7.[9]  BLM also considered potential cumulative impacts to the sheep, finding that "[t]here is currently increased interest in recreational activities in the steep, alpine terrain *for additional commercial heli-skiing operations* . . . as well as commercial filming of snowboarding and skiing activities."  *Id.* at 13 (emphasis added).  Ultimately, BLM was satisfied that the permit terms were sufficient to protect the Dall sheep and other wildlife resources.  *Id.*  In a separate document required under the Alaska National Interest Lands Conservation Act ("ANILCA"),[10] BLM likewise concluded that "[t]he short duration of the operation, coupled with the wildlife avoidance stipulations, will ensure that wildlife disturbance is held to a minimum" and that "access to subsistence resources [including Dall sheep] will not be hampered by the proposed activity."  ANILCA 810, Ex. 4, 2-3.

Safety was considered throughout the EA process.  Plaintiff was required to submit an Operations and Safety Plan, which was approved by BLM during the permitting process and incorporated into the permit.[11]  EA 7.  That plan contains a discussion of snow stability forecasting, Triumvirate Operations Plan, Ex. 9, 3-5, terrain selection, *id.* at 7, helicopter operations, *id.* at 8-10, emergency rescues, *id.* at 10-14, and other foreseeable emergency procedures.  All heli-skiing SRPs require that "authorized operators will assure that their

---

[9] The same term appears in the later-issued permits for Triumvirate, Silverton, and ASG.

[10] ANILCA requires Federal agencies to consider whether a permitted use of public lands may have an impact on substance resources utilized by rural Alaskans.  16 U.S.C. § 3120.  The ANILCA analysis for the Triumvirate heli-skiing permit application was required because wildlife within the area, including Dall sheep, may be legally hunted.  Triumvirate EA at 12, 14-15.

[11] The same requirement was imposed on Silverton and ASG.

operations meet Federal Aviation Administration ("FAA") requirements to achieve safe air operations (routing, airspace separation and coordination with other operators)," prohibit the use of explosives for avalanche mitigation, and allow BLM to modify or suspend the permit "if necessary to protect public resources, health, safety, or the environment or as a result of non-compliance with permit stipulations."  Triumvirate 2014 Permit, Ex. 5, 3-4; *see also* SMG 2017 Permit, Ex. 7, 3-4; ASG 2018 Permit, Ex. 8, 3-4.  All helicopters must be equipped with satellite/GPS transponders capable of providing live and historic flight data.  Triumvirate 2014 Permit, 4; *see also* SMG 2017 Permit, 4; ASG 2018 Permit 4; EA 7.

As BLM found in reaching a DNA, "[ASG's] proposed action is nearly identical to Alternative 2, the Proposed Action Alternative of the 2008 Environmental Assessment."  ASG DNA, Ex. 10, 2.  As with Triumvirate, ASG is permitted to operate two helicopters and one airplane, and authorized for a maximum of 130 landings per season.  *Id.* at 3-4.  ASG engages in the same activity, heli-skiing, and impacts to the aesthetic and recreational resources analyzed in the Triumvirate EA will be the same in nature and duration: temporary and transient.  *Id.* at 3. The same permit terms regarding avoiding wildlife within the permit area – analyzed and deemed sufficient in the Triumvirate EA – are present in the ASG permit.  ASG Permit 3.  The ASG permit contains identical terms regarding complying with FAA safety requirements, submitting a Safety and Operating Plan, refraining from the use of explosives for avalanche mitigation, and ensuring the availability of real time and historic flight data.  *Id.* at 3-4.  In fact, the ASG permit contains an additional term, requiring that ASG "communicate regularly throughout the season with [the] other two BLM-permitted operators in the area regarding their flight plans. *This will help to improve the client experience, maintain safety, and reduce the likelihood of mid-air collisions*."  *Id.* at 4 (emphasis added).  Finally, ASG's Guiding &

Outfitting Operating Plan represents that ASG's base of operations is located directly adjacent to the Neacola and thus ASG is able to keep more accurate snowpack data than the other two operators, that ASG "will be happy to share our [avalanche and stability forecasts] with TML and or Silverton," and also that ASG's close proximity would allow it to provide emergency services and shelter to other operators.  ASG Operations Plan 2017, Ex. 11, 7.

Plaintiff asserts that "[t]he effects of three commercial heli-skiing operations . . . are fundamentally different" than what was considered in the Triumvirate EA.  Pl.'s Mot. 22; *see also id.* at 21, 23, 24.  Beyond repeating that three is more than one, however, Plaintiff makes no serious attempt to show how an additional operator in a 428,000 acre area represents a significant change in circumstances or how the reasonably foreseeable environmental impacts differ substantially from those considered in the Triumvirate EA.  Plaintiff opines, in an "expert" declaration,[12] that "[i]t is extremely hazardous for a helicopter skiing pilot to fly around a peak or ridge and encounter another helicopter at an unexpected location."  Overcast Decl. ¶ 15.  While that hypothetical certainly does sound dangerous, Mr. Overcast does not quantify how likely such a scenario is or explain how existing permit conditions regarding complying with FAA requirements and providing real-time tracking of flight data, as well as ASG's requirement to coordinate flight traffic with Plaintiff and Silverton, fail to address the potential problem.  Likewise, Plaintiff's declarant suggests that additional operators will increase the risk of avalanche by some unspecified amount, but offers nothing in support of that conclusion beyond

---

[12] Plaintiff's declarant, Mr. Overcast, has not been qualified as an expert helicopter pilot, an expert in avalanche science, or an expert in any other subject.  Federal Defendants reserve the right to challenge Mr. Overcast's ability to offer expert testimony under Rule 702 and the *Daubert/Kumho Tire* standard at a later date.  *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

bare speculation that heli-skiing permittees might operate in unsafe areas and under unsafe conditions contrary to the practices outlined in their respective Safety and Operating Plans and, consequently, in violation of their permit terms. *Id.* at ¶ 19. These highly speculative and unsupported risks do not constitute a significant change in circumstances, especially in light of mandatory permit terms requiring all three operators adhere to safe heli-skiing protocols. BLM's finding that no significant new safety concerns were implicated by ASG's permit application was reasonable.

Plaintiff's allegation that BLM's environmental analysis is deficient with regard to impacts to Dall sheep is even flimsier. In its brief, the only environmental harm Plaintiff alleges is speculation that three operators can be anticipated to cause "substantially more noise," and therefore a substantially different impact, on the Dall sheep. Pl.'s Mot. 23; *see also* Overcast Decl. 13.[13] Plaintiff's conclusory assertion that additional permittees represent an "indisputably significant change in circumstances" aside, Plaintiff makes no attempt to show how ASG's permit will result in impacts to the Dall sheep. ASG's permit contains the same permit terms regarding avoiding areas in use by the sheep that were found sufficient in the Triumvirate EA. *See* ASG Permit 3. There, BLM found that "[a]s long as stipulations included in the EA are followed and new information on Dall sheep distribution and use of winter habitats is incorporated into future permit stipulations and considered permit decisions as it becomes available, no additional mitigation measures are recommended." EA 14. ASG's Operations Plan

---

[13] As an initial matter, and as discussed *supra* section I.A., Plaintiff has not alleged that it has any interest in Dall sheep. Neither Plaintiff's complaint, opening brief, nor the declaration of Plaintiff's owner and manager articulate an aesthetic, scientific, spiritual, or other interest in Dall sheep. Because Plaintiff has no legally cognizable interest in the Dall sheep, and because Plaintiff has not established either Article III or prudential standing to bring any other NEPA claim, this Court need not consider this claim further. *See Lujan*, 504 U.S. at 562-67; *see also Summers*, 555 U.S. at 493-96.

states that ASG will comply with environmental protection stipulations found in the permit, ASG's Operations Plan 3, and that ASG's close proximity to the permit area will allow it to help track wildlife in the area, potentially allowing for adaptive management that will further mitigate against any possible impacts to Dall sheep. *Id.* at 2, 7. In sum, in light of the nearly identical activity at issue, and in light of permit conditions deemed sufficient to protect the Dall sheep by the Triumvirate EA, BLM's finding that no additional NEPA analysis on the impacts of approving the ASG permit on the Dall sheep was reasonable.

Courts in this circuit have denied injunctive relief under similar circumstances. In *Friends of Animals,* animal welfare organizations filed a motion for a preliminary injunction to stop BLM's planned 2017 horse gather in Utah. *Friends of Animals*, 232 F. Supp. 3d at 58. Having previously analyzed the potential environmental effects of the action in an EA in 2008 and 2012, BLM prepared a DNA in 2016 that determined there was no new information requiring new NEPA analysis. *Id.* at 59. Plaintiffs sued under NEPA, seeking injunctive relief, alleging that issuance of the DNA was arbitrary and capricious. *Id.* The U.S. District Court for the District of Columbia denied the plaintiffs' motion, finding that (1) even though the new action involved more horses, it was substantially similar and generally consistent with the action analyzed by the EA; (2) plaintiffs did not meet their burden of showing that the new action would "affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered." *Id.* at 62 (quoting *Marsh*, 490 U.S. at 374). The Court's holding in *Friends of Animals* is consistent with the holding in *Colorado Wild Horse* where plaintiffs' requested injunction was denied and BLM's DNA was upheld. Similarly, this Court should find Plaintiff has no likelihood of success and deny its Motion.

   2. Because its DNA is reasonable, BLM was not required to consider additional
      alternatives to the proposed action or provide for additional public comment.

Because, as discussed *supra*, BLM's DNA was reasonable, Plaintiff's alternatives and public participation claims are without merit.  It is true, of course, that BLM must consider a range of reasonable alternatives in preparing a NEPA document.  *See* 40 C.F.R. § 1508.9 (requiring a discussion of alternatives in preparation of an EA); 40 C.F.R. § 1502.12 (requiring a discussion of alternatives in preparation of an EIS).  But a DNA is not a NEPA document; rather, it is a determination that a proposed action's impacts have been adequately examined through an earlier NEPA process and that no new NEPA document is required.  *See* 40 C.F.R. § 1508.10; DOI Manual Part 516 Chapter 11 p. 5 ¶ 11.6.  Because the Triumvirate EA, and the discussion of alternatives within it, sufficiently analyzed the issues presented by ASG's application for a nearly identical permit, BLM was not required to weigh additional alternatives in deciding whether to issue a permit to ASG.  *See Colorado Wild Horse,* 130 F. Supp. 3d at 218 (holding that, "[b]ecause BLM clearly seems to have taken a 'hard look' at the available evidence and the alternatives to the proposed action" in a previous EA, Plaintiffs were not likely to prevail in their challenge to the adequacy of a DNA).  Plaintiff is not likely to prevail on its alternatives claim.

In support of its public notice claim, Plaintiff relies on case law and regulations mandating public participation in the context of an EIS or other NEPA document.  Pl.'s Mot. 26.  Once again, a DNA is not a NEPA document.  *See* 40 C.F.R. § 1508.10.  Case law and regulations mandating public input in preparing a NEPA document are thus not on point.  To the contrary, courts have found that documents like DNAs, designed to assist the agency in determining whether significant changes exist, are not subject to public comment requirements.  *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("Although NEPA requires agencies to allow the public to participate in the preparation of an [Supplemental] EIS, there is no such requirement for the decision whether to prepare an [Supplemental] EIS.");

*California v. Watt,* 683 F.2d 1253, 1268 (9th Cir. 1982), *rev'd on other grounds sub nom.,*

*Secretary of the Interior v. California,* 464 U.S. 312, (1984) ("the public comment process . . . is

not essential every time new information comes to light . . . Were we to hold otherwise, the

threshold decision not to supplement an EIS would become as burdensome as preparing the

supplemental EIS itself, and the continuing duty to gather and evaluate new information . . .

could prolong NEPA review beyond reasonable limits."); *California ex rel. Imperial Cty. Air*

*Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 797 (9th Cir. 2014) (agency

did not err by writing an environmental evaluation [document similar to DNA] without prior

public input.); *League v. U.S. Forest Serv.*, No. 4:11CV00425 JM, 2016 WL 3511691, at *3

(E.D. Ark. Mar. 16, 2016) (no NEPA violation where agency did not offer public participation in

the preparation of SIR.)

Plaintiff's reliance on *American Bird Conservancy* is particularly off-base.  Pl.'s Mot. 28

(citing *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008)).  There, the

D.C. Circuit construed regulations mandating that members of the public be afforded an

opportunity to petition the FCC to require an EA for what would otherwise be categorically

excluded tower applications.  *Am. Bird Conservancy*, 516 F.3d at 1035 (citing 47 C.F.R. §

1.1307).  Here, plaintiffs do not rely on any agency regulations, and the ASG permit at issue was

not the product of a categorical exclusion.  Finally, although the agency was not obligated to

solicit public comments, it did in fact consider the email exchanges and phone calls between

Plaintiff and BLM.  *See* Kuhns Decl. ¶ 17; attachments to Kuhns Decl.  For the above reasons,

Plaintiff cannot succeed on its public notice claim.

Triumvirate's transparent attempt to use NEPA and the APA to bludgeon a competitor

from the market should be rejected.  *See* Overcast Decl. ¶ 26 ("Triumvirate invested, financed, or

spent millions of dollars for Lodge facilities, infrastructure, buildings, and other structures after 2013, and millions of dollars investing in helicopters, aircraft, radio repeaters, and the other necessary infrastructure to support commercial helicopter skiing operations"); *id.* at ¶¶ 38d and f (BLM's decision creates "competition for the prime skiing locations" and "will likely result in a reduction in business viability").  As BLM previously found, "[t]he recreation potential for the Neacola Mountains is largely unmet" and "[a]uthorizing the requested SRP will provide a unique recreational experience in a remote and primitive setting, consistent with the RMP/ROD goals for the Neacola Mountains ACEC without compromising other resource values, specifically, visual resources or wilderness characteristics."  Decision Record 2 (citations omitted).[14]  ASG's proposed use is virtually identical to that of Triumvirate's, and is likewise in line with BLM's multiple use mandate because ASG will provide additional, responsible access to an underutilized wilderness area.  The safety and environmental concerns Plaintiff raises were considered in the Triumvirate EA and are addressed directly by permit conditions applicable to all operators.  BLM's conclusion that the Triumvirate EA adequately addressed the likely impacts associated with ASG's permit is reasonable, and Plaintiff's NEPA claims are therefore futile.

### C.  PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS FLPMA CLAIMS

Plaintiff argues that BLM violated the Ring of Fire RMP, and consequently FLPMA's requirement that actions within the planning area be consistent with the applicable RMP, when it failed to (1) "work collaboratively with Triumvirate;" (2) consider "new public safety and environmental issues associated with authorizing a third heli-ski guide;" and (3) "manage

---

[14] Additionally, as previously discussed, the EA states that additional commercial heli-skiing operations are possible.  EA 13.

'existing opportunities' for public recreation" within the permit area. Pl.'s Mot. 30. These claims lack merit.

The Ring of Fire RMP "provides a public document that specifies management policies and actions for BLM-managed lands." Ring of Fire ROD, Ex. 12, 25. The language Plaintiff quotes speaks generally of "goals" and "objectives" regarding "managing recreation to maintain the existing opportunities" and "working collaboratively with landowners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities."[15] *Id.* at 10. In regards to stakeholder engagement, the RMP provides more guidance, explaining that "stakeholder relationships are driven by the public process including the public comment process required by proposals being evaluated using the National Environmental Policy Act . . . and other laws and directives." *Id.* at 26. In regards to recreation, the RMP provides that the "goal" is to "[m]anage recreation to maintain a diversity of recreational opportunities. Opportunities for commercial recreation will be provided consistent with area objectives for recreation management." *Id.* at 39.

Plaintiff construes the RMP to require BLM to consult with Plaintiff prior to issuing a permit to an industry competitor. The plain language of the RMP imposes no such obligation, instead constituting the sort of "non-binding guidance for recreation planning . . . [that] does not appear to create any obligation[.]" *Wild Wilderness v. Allen*, 871 F.3d 719, 726 (9th Cir. 2017).

---

[15] BLM defines "goals" as "broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable." BLM Planning Handbook at 18 (available at https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf). Similarly, BLM defines "objectives" as "identify[ing] specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: 'Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species.'" *Id.*

Put differently, the language cited "outlines 'an aspiration, not an obligation' and therefore 'there is no law for us to apply in second-guessing the agency.'" *Id.* Language from elsewhere in the RMP confirms its intention to impose no greater public involvement requirements than those of "the NEPA . . . and other laws and directives." Ring of Fire ROD 26. In the instant case, as discussed *supra*, no new NEPA document – and consequently no public involvement – was required. Had BLM declined to solicit Plaintiff's views on the ASG permit, that decision would have violated no requirement in the RMP.

But BLM did, in fact, request Plaintiff provide its thoughts on the ASG permit. On December 12, 2017, in response to a question regarding the possibility of a third heli-skiing permittee, BLM requested that Plaintiff provide "thoughts and concerns with adding a third operator." Kuhns Decl. ¶ 17; attachments to Kuhns Decl. Plaintiff's representative Mike Overcast responded that he was "adamantly opposed too [sic] further permitting in the Neacolas" and that an additional permittee would somehow "compromise public safety." *Id.* On December 15, 2017, Mr. Overcast spoke on the phone with Doug Ballou of BLM, and expressed that an additional operator would create safety concerns and "degrad[e] the quality of his client's experience" by leaving tracks in the snow. Attachments to Kuhns Decl. On that same call, Mr. Overcast complained that the EA that he paid for[16] was being used to permit additional operators, as well as that "he was 'just getting things going' in his business and that he had 13 competitors state wide." *Id.* Ballou suggested that Field Manager Bonnie Million would be willing to schedule a call to discuss Overcast's concerns, but Overcast apparently declined that

---

[16] BLM and Plaintiff recognized that Triumvirate was likely the first of several future applicants to provide recreational heli-skiing in the area and, therefore, BLM agreed to pay for half of the costs associated with preparing the EA. The total cost to Triumvirate was less than $2300. *See* Kuhns Decl. ¶ 4.

offer.  *Id.*  Thus, even to the extent the RMP required BLM to solicit input from other permittees regarding a competitor's permit application, BLM in fact did so.

Plaintiff's argument that BLM violated the RMP by failing to consider public safety concerns also fails.  While the Ring of Fire RMP does not directly speak to the consideration of public safety in issuing commercial recreation permits, Plaintiff is correct that, in making a decision whether to issue a special recreation permit, BLM regulations require consideration of public safety.  *See* 43 C.F.R. § 2932.26.  The record documents evince that BLM complied with this requirement.  The Conditions and Stipulations for ASG's permit require that ASG meet Federal Aviation Administration requirements to achieve safe air operations.  ASG Permit 3. ASG is "required to submit and abide by a Safety and Operating Plan" approved by BLM and incorporated into the permit.  *Id.*  ASG is prohibited from using explosives for avalanche mitigation and all helicopters are required to be equipped with satellite transponders with web-based tracking capability to allow BLM to monitor flight data.  *Id.* at 4.  Violation of these terms may result in BLM suspending or modifying the permit "if necessary to protect public resources, health, safety, or the environment."  *Id.*  Possible safety issues were considered in reaching the DNA, where BLM noted that "[t]he typical client to guide ratio [for ASG] will be 4:1.  The ratio will take into account skier ability levels, weather, avalanche conditions, and other hazards." ASG DNA 3.  Further, ASG's Operations Plan details the health and safety measures ASG will take to minimize the risks inherent in heli-skiing, such as weather risks, avalanche, exposure, or accidental injury.  *See* ASG Operations Plan 3-5.  Finally, ASG's Operations Plan notes that ASG is based on private land adjacent to the Neacola, has accurate records regarding avalanche and stability forecasts, "will be happy to share our forecasts with TML and or Silverton," and is positioned to provide "emergency assistance in the event of avalanche or ski accident of any

kind, first responders in the event of a helicopter accident, [and] first responder[s] to a mechanical issue with [a] helicopter that leaves one of the distant operators [Triumvirate or Silverton] stranded in the Neacola." *Id.* at 7. The record documents show that, in accordance with applicable regulations, BLM thoroughly considered public safety in deciding to issue the ASG permit.

Finally, in a single conclusory statement, Plaintiff avers that BLM's issuance of a permit to ASG "fail[ed] to manage 'existing opportunities' for public recreation in the ACEC." Pl.'s Mot. 24. Plaintiff makes no attempt to explain how introducing an additional heli-skiing provider would reduce existing opportunities for heli-skiing. Logically, the result would be just the opposite. Plaintiff has failed to adequately brief this issue, and this Court need not reach it. *See Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 298 (D.D.C. 2012) ("Courts need not consider cursory arguments of this kind."); *see also Cement Kiln Recycling Coal.,* 255 F.3d at 869 (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'" (quoting *Wash. Legal Clinic for the Homeless,* 107 F.3d at 39 )). To the extent this Court construes Plaintiff's argument as referencing diminished powder skiing resources for Plaintiff and its customers, as discussed in Plaintiff's declaration, *see* Overcast Dec. ¶ 38f, the utilization of that recreation resource by other members of the public does not equate to a reduction in existing opportunities for public recreation.[17] The issuance of ASG's permit is consistent with the RMP's stated goal of maintaining existing recreational opportunities. *See* Ring of Fire ROD 17 and 39.

---

[17] Plaintiff avers in its declaration that "[u]ntracked snow is unlike other outdoor pursuits . . . Powder snow is a finite resource that cannot be skied over and over and expect our guests to enjoy." Plaintiff has not directed this Court to, and Federal Defendants are not aware of, any statutory or contractual basis for Plaintiff's apparent claim to a sole or primary right in powder snow on Federal lands.

Plaintiff's FLPMA arguments are conclusory, without merit, and contradicted by the record.  Plaintiff has no likelihood of success on its FLPMA claims.

### D.  PLAINTIFF'S APA CLAIM FAILS

Plaintiff's claim that "BLM violated substantive requirements of the APA" has no likelihood of success on the merits.  *See* Pl.'s Mot. 24-25.  The APA provides a cause of action only where a person has suffered a "legal wrong because of agency action, or [has been] adversely affected or aggrieved by agency action *within the meaning of a relevant statute*."  5 U.S.C. § 702 (emphasis added).  The relevant statute, of course, is the statute whose violation is the gravamen of the complaint.  *Nat'l Wildlife Fed'n*, 497 U.S. at 886.  Absent a statute with substantive standards, judicial review is precluded because there is no "law to apply" and "no meaningful standard against which to judge the agency's exercise of discretion."  *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).  Consequently, a claim that fails to identify a relevant statute under which APA review can proceed cannot qualify for the APA's private right of action.  *See Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998); *Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 953 n.2 (6th Cir. 1971); *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996); *El Rescate Legal Servs. v. Exec. Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991); *Sierra Club v. Martin*, 110 F.3d 1551, 1555 (11th Cir. 1997).

Courts do not recognize stand-alone APA claims.  Plaintiff's APA claim merely rehashes the applicable legal standard under which the Court reviews the NEPA and FLPMA claims.  Standing alone, this claim fails.  *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 29 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ("th[e] right to review of administrative action [afforded by the APA] does not stand alone; persons seeking APA

review must show some independent statutory right to which they are entitled"); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) ("When deciding whether an agency action was arbitrary or capricious, courts must determine the scope of the duty imposed on the agency by Congress in the relevant substantive statute.").

Even if the Court considers such a claim cognizable, for the reasons stated above in the NEPA and FLPMA-specific sections, Plaintiff has no likelihood of success in showing that BLM acted arbitrarily and capriciously.

## II.    PLAINTIFF FAILS TO ESTABLISH IMMINENT, IRREPARABLE HARM

### A.  PLAINTIFF'S ALLEGED HARM IS NEITHER IRREPARABLE NOR IMMINENT

A plaintiff seeking a preliminary injunction must make two showings in order to demonstrate irreparable harm—"[f]irst, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  "Second, the harm 'must be beyond remediation.'"  *Id.*  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Sampson*, 415 U.S. at 90 (citations omitted).

Plaintiff's harms -- its potential economic losses, theoretical public safety concerns, and alleged procedural deficiencies by BLM -- fail to establish an imminent, irreparable harm justifying an injunction.  First, Plaintiff alleges that it suffers imminent and irreparable harm because of BLM's purported failure to comply with NEPA.  Pl.'s Mot. 25-26.  In support, Plaintiff cites to three cases, none of which stand for the principle that an alleged procedural

injury alone (without harm to the physical environment) establishes irreparable harm.  The Court in *Fund for Animals v. Norton* expressly held that "defendants appear to be correct in their assertion that the procedural harm arising from a NEPA violation is insufficient, *standing alone,* to constitute irreparable harm."  *Fund For Animals v. Norton*, 281 F. Supp. 2d at 209, 222 (D.D.C. 2017).  Plaintiffs in that case were able to show irreparable harm only because of the procedural harm *combined* with the harm to the physical environment – the killing of swans – whereas here, Plaintiff fails to allege a harm to the physical environment.  *See Friends of Animals,* 232 F. Supp. 3d at 66.  The decision in *Yellowstone Coalition* is wholly inapplicable to the irreparable harm prong of an injunction as that decision was based on cross-motions for summary judgment and did not involve a request for emergency relief.  The final case cited by Plaintiff, *Foundation on Economic Trends v. Heckler*, upheld an injunction where plaintiffs identified a NEPA deficiency *and* an alleged harm to the physical environment; namely, the documented dispersion of recombinant-DNA-containing organisms by the National Institute of Health into the environment without considering the impact of the genetically altered bacteria on plants and animals.  756 F.2d 143, 153-54 (D.C. Cir. 1985).  The facts of *Foundation on Economic Trends* are simply not analogous to the facts of this case.

In an attempt to allege an environmental injury and not just a procedural one, Plaintiff alleges that it suffers imminent and irreparable harm because of a potential risk to public safety, Pl.'s Mot. 26-27, and impacts to "wildlife and other ecological resources," *id*.  To support its potential risk to public safety argument, Plaintiff relies solely on *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C 2009), which is distinguishable from this case.  In *Brady*, plaintiffs alleged that the Department of the Interior ("DOI") had reversed a twenty-five year rule that had been in place regarding concealed firearms in national parks,

without performing an EA or EIS.  Plaintiffs filed a motion for a preliminary injunction and the court found that plaintiffs established a likelihood of irreparable harm because they were able to show a likely impact to the environment; namely, the injuring or killing of wildlife within national parks.  *Brady Campaign to Prevent Gun Violence,* 612 F. Supp. 2d at 20-21.  In finding a likelihood of damage to the physical environment, the court relied on excerpts from the administrative record, including public comments that: "[a] preliminary injunction would take away the ability of sportsmen and women to defend themselves from wildlife;" "[t]he regulation was crafted to . . . assist[] park personnel to prevent unlawful killing of wildlife;" and I want "my fire arm [sic] with me for possible wild animal attack."  *Id.*  Here, unlike in *Brady*, Plaintiff has not provided this Court with any evidence that the physical environment is likely to be harmed.[18]  Plaintiff's reliance on *Brady*, its sole case to demonstrate irreparable harm, is unpersuasive.

Plaintiff's argument regarding impacts to wildlife also fails.  Plaintiff claims that it "does not know" how wildlife may be impacted, but assures the Court that the impacts are "certain, actual, and imminent."  Pl.'s Mot. 27.  Plaintiff fails to provide the Court with even the slightest support for its conjecture that wildlife could be impacted from helicopter noise, and it fails to explain why that impact would be different than it was in 2017 when three helicopter operators were permitted to fly in the same 428,000 acre region.  Plaintiff's cite to *Amoco Prod. Co. v.*

---

[18] Further, while *Brady* has not been overruled, its precedential value for establishing imminent harm has been questioned.  *See Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1094-95 (D. Kan. 2015) ("Before the Supreme Court's decision in [*Clapper*] some courts accepted such 'special risk' theories as sufficient to demonstrate an actual or imminent injury . . . Since *Clapper,* courts have recognized that the relevant inquiry is not whether the plaintiff suffers a 'special risk' of injury, but whether the risk they experience is 'certainly impending.').  *See, e.g.*, *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011) (overturning district court's grant of an injunction when the district court relied on *Brady* to establish irreparable harm) vacating *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1054 (N.D. Cal. 2010).

*Gambell*, 480 U.S. 531, 545 (1987), a case widely known to stand for the principle that alleged

environmental harms do *not* create a presumption of irreparable harm.  *See Nat'l Parks*

*Conservation Ass'n v. U.S. Forest Serv.*, No. 15-CV-01582 (APM), 2016 WL 420470, at *11

(D.D.C. Jan. 22, 2016).  Plaintiff's speculative, unsupported assertion on impacts to wildlife fails

to demonstrate irreparable harm.[19]

### B.  PLAINTIFF'S DELAY COUNSELS AGAINST A FINDING OF IRREPARABLE HARM

Preliminary injunctions are generally granted under the theory that there is an urgent need

for speedy action to protect the plaintiff's rights.  Indeed, "'[a]n unexcused delay in seeking

extraordinary injunctive relief may be grounds for denial because such delay implies a lack of

urgency and irreparable harm.'"  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F.

Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C.

2005).  This Court and the D.C. Circuit have underscored a plaintiff's delay when denying

motions for a preliminary injunction.  The District of Columbia Circuit in *Frizzell*, for example,

reasoned that its decision to deny the plaintiffs' motion for preliminary injunction was

"bolstered" by the plaintiffs' 44-day delay in bringing suit.  *Fund for Animals v. Frizzell*, 530

F.2d 982, 987-88 (D.C. Cir. 1975).  The plaintiffs in *Frizzell* challenged the close of a comment

period for proposed regulations, but they knew of the comment period deadline 44 days before

bringing suit and requesting preliminary injunctive relief.  *Id.*  The Court stated that the delay

---

[19] Plaintiff's Motion does not expand on the economic harms that are discussed in the Overcast Declaration, *see* Overcast Decl. ¶¶ 23, 26; 38d; 38e; 38f; 38g; 38j; 42.  However, those harms similarly fail to establish imminent and irreparable injury.  *See, e.g., Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1295 (D.C. Cir. 2009) (noting the "general rule that economic harm does not constitute irreparable injury"); *Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*, No. 17-CV-2758 (CRC), 2018 WL 784061, at *12 (D.D.C. Feb. 8, 2018) (denying preliminary injunction where business competitor's "injury is insufficient for purposes of irreparable harm.").

was "inexcusable." *Id*. at 987.  This Court also determined that a delay of 36 days in bringing a preliminary injunction motion, paired with a request to push back the Court's consideration, "demonstrated that any alleged harm lacks the urgency and immediacy required to grant the extraordinary relief the plaintiffs[] request." *Open Top Sightseeing*, 48 F. Supp. 3d at 91.

Plaintiff failed to seek emergency relief in late 2016 when three companies were permitted to operate helicopters in the area.  Plaintiff was issued a permit by BLM's Anchorage Field Office to begin operating in 2014.  Kuhns Decl. ¶ 3.  From 2015 through 2017, TGR was permitted to operate helicopters in the same area, and in February 2017, SMG was permitted to operate heli-skiing services.  Kuhns Decl. ¶¶ 7-9.  Plaintiff did not seek emergency relief in early 2017 when SMG received its permit, nor did Plaintiff initiate any civil suit to obtain a judgment on the merits in the past year.  Further, Plaintiff cannot provide this Court with evidence of increased helicopter accidents, avalanches, or harm to the public resulting from three permitted operators from 2017 to the present.  It was not until a third recreational heli-skiing operator was permitted that Plaintiff initiated a suit seeking the extraordinary remedy of injunctive relief.  Plaintiff's own delay and failure to bring a lawsuit as early as February 2017 counsels against a finding of irreparable harm, and illustrates Plaintiff's inability to provide the Court with support for its alleged harms.

## III.   THE EQUITIES COUNSEL AGAINST INJUNCTIVE RELIEF

In considering the extraordinary remedy of an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotations and citations omitted).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences . . . ." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

Where the defendant is the government, the Court may consider these final two factors together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

BLM and the public at large share an interest in permitting ASG to operate in the Neacola and Tordrillo Mountains rather than allowing a single permittee to enjoy an exclusive license to provide those services. BLM's mission is to "sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations." *See* 43 U.S.C. §§ 1701 and 1702. As such, BLM is statutorily charged with taking a "multiple use" approach, managing the public lands under its jurisdiction for a variety of purposes, including recreational activities. *Id.* Federal courts often look to acts of Congress to determine where the public interest lies. *See, e.g., Amoco*, 480 U.S. at 545-46. FLPMA and BLM's multiple use mission allow for multiple users of federal lands. Issuing permits that allow a greater segment of the public to enjoy remote public lands benefit both the public and the economy of Alaska while preserving the area's scenic qualities and fulfilling BLM's statutory responsibilities. Since Plaintiff has only identified theoretical public safety concerns and potential economic harm to its business, the equities weigh in Federal Defendants' favor. One company's desire to limit competition should not be given more weight than BLM's statutory multiple use mandate and the public's desire to utilize and enjoy public lands.

## CONCLUSION

Plaintiff has not established that this Court has jurisdiction over its claims or that it has prudential standing. Even if the Court decides Plaintiff's Motion, Plaintiff fails to establish irreparable harm, a likelihood of success on the merits of its claims, or that the equities weigh in its favor. Plaintiff simply cannot meet its heavy burden to show that extraordinary injunctive relief is warranted. The Court should deny Plaintiff's Motion and dismiss the complaint.

Respectfully submitted this 12th day of March, 2018,

JEFFREY H. WOOD
United States Department of Justice
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/  *S. Derek Shugert*

S. DEREK SHUGERT (OH No. 84188)

TYLER M. ALEXANDER (CA Bar No. 313188)
Natural Resources Section
Trial Attorneys
PO Box 7611
Washington, DC  20044-7611
Tel: (202) 514-9269 (Shugert)
Tel: (202) 305-0238 (Alexander)
Fax: (202) 305-0506
shawn.shugert@usdoj.gov
tyler.alexander@usdoj.gov

Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of March, 2018, I filed the foregoing

document electronically through the CM/ECF system, which caused all parties or counsel of

record to be served by electronic means, as more fully reflected on the Notice of Electronic

Filing.

_____/s/  *S. Derek Shugert*_____
S. Derek Shugert
Attorney for Federal Defendants